**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.  21-cv-02818

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,
C.B., by and through his parent and next friend, E.B.,
A.R., by and through his parent and next friend, L.R.,
J.G., by and through his parent and next friend, K.G.,
B.A., by and through her parent and next friend, J.A.,
M.M., by and through her parent and next friend, K.M.,
D.B., by and through his parent and next friend, J.B.,
R.P., by and through her parent and next friend, B.H.,
D.W., by and through his parent and next friend, G.W.,
A.L., by and through his guardian and next friend, C.L.

**Plaintiffs**;

v.

DOUGLAS COUNTY HEALTH DEPARTMENT,
DOUGLAS COUNTY BOARD OF HEALTH

**Defendants**.

---

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

---

*"This is not a close call…[M]easures disallowing school districts from mandating*
*masks…discriminate[ ] against children with disabilities."*[1]

On October 8, the Douglas County Health Department ("DCHD") issued a Public Health

Order ("DCHD PHO") allowing parents and legal guardians of underage students to be exempt

from the School District's universal mask requirement if they feel that a mask has "a negative

---

[1] *Disability Rights South Carolina v. McMaster*, No. 3:21-02728-MGL, 2021 WL 4444841, at *11 (D. S.C. Sept. 28, 2021).

1

impact on that individual's physical and/or mental health." Furthermore, the DCHD PHO hinders efforts to contain the spread of COVID-19 in DCSD schools since the DCHD Order prohibits the quarantine of students "because of exposure to a known COVID-19 positive case unless the exposure is associated with a known Outbreak."—meaning someone can come to school, knowing they have been exposed to COVID-19, and efforts to quarantine the student cannot be implemented consistent with Colorado Department of Public Health and Environment ("CDPHE") and Tri-County Health Department ("TCHD") guidance.

To justify this Order, DCHD suggests that masks are causing a mental health crisis among youth, citing to a declaration by Children's Hospital of Colorado of "a state of emergency for youth mental health with suicide becoming the leading cause of child death in the state . . . ." This central premise is demonstrably false. Indeed, Children's Hospital itself has controverted this statement, explaining that "[t]here are no valid reports or scientific studies linking masks to mental health problems in children or any other group."[2] An administrator with the Hospital echoed this point during the public hearing on the Order, stating that Children's Hospital "<u>wants to make it very clear that there are no valid reports or scientific studies linking masks to mental health problems in children or any other group.</u>"[3]

The DCHD PHO went into effect on Saturday, October 9, 2021. Since then, over the course of five school days,[4] the rate of mask-wearing has dropped from 97% to 83%, and over 4,500 students and over 500 staff have been exempted from of wearing a mask. The School District fears

---

[2] Children's Hospital Colorado, Masks for Kids: What You Need to Know About Face Coverings, Aug. 16, 2021, available at: https://www.childrenscolorado.org/conditions-and-advice/parenting/parenting-articles/masks-for-kids/

[3] Recording available at: https://www.douglas.co.us/government/commissioners/citizen-advisory-boards-committees-and-commissions/board-of-health/  (48:53 – 52:00) (emphasis added).

[4] DCSD is on Fall Break this school week and will return for classes Monday, October 25, 2021.

that it will not be long before the rate of mask wearing in DCSD schools will reach the extremely low levels the School District experienced before requiring masks in early September. This is alarming, especially when the DCHD PHO prohibits quarantining efforts consistent with CDPHE and TCHD guidance.

The DCHD PHO is doing more than putting kids at risk of harm: it is also violating the civil rights of students with disabilities. The ADA and Section 504 prohibit discrimination based on a disability. Both statutes require that public entities or those receiving federal funds, like the School District, provide students with disabilities equal access to their programs and services. Under these laws, schools build ramps to accommodate students with physical limitations and scrub cafeteria kitchens of peanuts to accommodate children with peanut allergies, among other things. Along these lines, protocols requiring universal masking and quarantining of students exposed to COVID-19 are reasonable accommodations enabling disabled students with underlying health conditions, and thus greater risk of contracting or becoming severely ill from COVID-19, to access their public education equally to their non-disabled peers.

The individual Plaintiffs are students with disabilities within the meaning of the ADA and Section 504 who have underlying health conditions that put them at greater risk of contracting COVID-19, like intellectual, physical, and developmental disabilities, or a greater risk of severe illness and possibly death if they contract COVID-19, like asthma, cystic fibrosis, epilepsy, diabetes, and Down Syndrome. Universal masking and targeted quarantining of individuals exposed to COVID-19, consistent with CDPHE and TCHD guidance, are reasonable and necessary accommodations to enable these students to access their public education equally to their non-disabled peers. Because the DCHD PHO allows individuals to easily be exempt from the School District's mask requirement and minimizes the ability to effectively quarantine students to mitigate

against the spread of COVID-19, Defendants are illegally preventing the School District from complying with the ADA and Section 504. Even worse, Defendants are illegally forcing the parents of these students to choose between their child's education and their health and safety. No child or parent should face that dilemma.

The School District and the individually named Plaintiffs seek immediate and permanent relief against this illegal DCHD PHO and with it the ability to require universal masking in schools, except for limited medically necessary exceptions, and the ability implement quarantines consistent with CDPHE and TCHD guidance. The health, lives, and civil rights of our students demand nothing less.

## D.C.COLO.LCivR 65.1(a) CERTIFICATES

Undersigned counsel will provide notice of the filing of this motion to the Douglas County Attorney's Office, counsel for Defendants, contemporaneously with the filing of this motion. Undersigned counsel will also provide the Douglas County Attorney's Office with copies of this motion and all other pleadings and documents filed today in this action.

## FACTUAL ALLEGATIONS

### COVID-19 is a Highly Contagious Disease

COVID-19 is a highly communicable virus that spreads when an infected person breathes out droplets and very small particles that contain the virus and another individual breathes in the droplets or particles, or the droplets or particles land on the individual's eyes, nose, or mouth.[5]

Individuals infected with COVID-19 who either do not exhibit symptoms ("asymptomatic") or have not yet exhibited symptoms ("pre-symptomatic") may be unaware that

---

[5] CDC, Scientific Brief: SARS-CoV-2 Transmission, May 7, 2021, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html.

they are spreading COVID-19 because, for example, they feel perfectly fine. Individuals who are asymptomatic and pre-symptomatic are estimated to account for more than 50% of transmissions.[6]

Since the inception of the COVID-19 pandemic, more than 688,465 positive cases of COVID-19 in Colorado have been recorded, more than 39,450 Coloradans have been hospitalized, and more than 7,996 have died.[7] At least 1 in 9 Douglas County residents have been infected, a total of 38,196 reported cases, and at least 349 individuals have died.[8] Cases peaked in Colorado in December 2020. The number of deaths, hospitalizations, and infections began declining in early-to-mid 2021, reaching a low in July 2021, once vaccines became available. The medical landscape, however, drastically changed with the arrival of the highly contagious and virulent Delta variant of COVID-19.[9]

The number of newly reported cases, hospitalizations, and deaths from COVID-19 have all increased sharply across Colorado, including in Douglas County. There, an average of 103 cases per day were reported, a 31% increase from the average only two weeks ago.[10] And the test positivity rate in Douglas County is high, suggesting that cases may be undercounted.[11]

---

[6] CDC, Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2, available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars cov2.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fmore%2Fmasking-science-sars-cov2.html (last visited Oct 10, 2021).

[7] CDPHE, Colorado COVID-19 Data, https://covid19.colorado.gov/data (last visited Oct. 11, 2021).

[8] *Id.*

[9] CDPHE, Colorado COVID-19 Incidence, Oct. 8, 2021, available at: https://cdphe-data.shinyapps.io/twoweek_incidence/; CDC, Delta Variant: What We Know About the Science, Aug. 6, 2021, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (noting that the Delta variant is "more than 2x as contagious as previous variants" and studies indicated that "patients infected with the Delta variant were more likely to be hospitalized").

[10] NYTimes, Tracking Coronavirus in Douglas County, Colorado, available at: https://www.nytimes.com/interactive/2021/us/douglas-colorado-covid-cases.html (last visited Oct. 11, 2021).

[11] *Id.*

The newest data on the Delta variant is particularly troubling for students and school districts. For example, data shows children are infected with the Delta variant at much higher rates than was true with previous virus strains, especially those who are unvaccinated (including those under 12 years old who are not yet eligible to receive a vaccine).[12] According to the American Academy of Pediatrics, "the Delta variant has created a new and pressing risk to children and adolescents across this country."[13]

The view close to home is especially concerning. Children are now accounting for over 18% of all COVID-19 cases in Colorado.[14] And, as the American Academy of Pediatrics explained in a letter to the Food and Drug Administration on August 5, 2021, "[t]he higher proportion of cases in this population means this age group could be contributing in driving continued spread of COVID-19. Sadly, over 350 children have died of COVID-19 since the start of [the] pandemic and

---

[12] CDC, Morbidity and Mortality Weekly Report Sept. 10, 2021, available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7036e1.htm?s_cid=mm7036e1_w. Nationally, as of September 30, 2021, children represented 16.2% of all COVID-19 infections. American Academy of Pediatrics and the Children's Hospital Association, Children and COVID-19: State Data Report, Sept 30, 2021, available at https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20-%20Children%20and%20COVID-19%20State%20Data%20Report%209.30%20FINAL.pdf. In Colorado, as of September 30, 2021, children represented 18.1% of all COVID-19 infections. https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20-%20Children%20and%20COVID-19%20State%20Data%20Report%209.30%20FINAL.pdf.

[13] American Academy of Pediatrics, Letter to FDA, Aug 5, 2021, available at: https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authorization%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf.

[14] CDPHE, Colorado COVID-19 Data, https://covid19.colorado.gov/data (last visited Oct. 11, 2021). For the week ending October 7, children were 24.8% of reported weekly COVID-19 cases (children, under age 18, make up 22.2% of the US population). American Academy of Pediatrics, Children and COVID-19: State-Level Data Report, Oct. 11, 2021, available at: https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/.

millions of children have been negatively impacted by missed schooling, social isolation, and in too many cases, the death of parents and other caregivers."[15]

The increase in COVID-19 rates among children has also coincided with the start of school. As of September 30, pediatric cases represented over 16% of the total U.S. cases, with nearly 5.9 million children testing positive since the pandemic began.[16] Nearly 850,000 pediatric cases were added in the month of September, with over 173,000 added in the final week.[17] Unfathomably, 171 children died between the American Academy of Pediatrics reports of August 5 and October 7, 2021, bringing the total number of COVID-19 deaths of children to 542.[18]

### Individuals with Underlying Health Conditions
### Face Greater Risk of Severe Illness from COVID-19

Individuals infected with COVID-19 may experience a range of symptoms, including but not limited to: fever or chills; cough; shortness of breath or difficulty breathing; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; and diarrhea.

COVID-19 does not affect all groups equally. Some specific groups of individuals— including individuals with certain disabilities, particularly underlying medical conditions—are at

---

[15] American Academy of Pediatrics, Letter to FDA, Aug 5, 2021, available at: https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authori zation%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf.

[16] American Academy of Pediatrics, *Children and COVID-19: State-Level Data Report*, (Oct. 4, 2021), available at: https://www.aap.org/en/pages/2019-novelcoronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/.

[17] *Id.*

[18] Children and COVID-19: State Data Report at App'x Tab. 2C, Children's Hosp. Ass'n & Am. Acad. Pediatrics (Sept. 30, 2021), https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20- %20Children%20and%20COVID19%20State%20Data%20Report%209.30%20FINAL.pdf.

an increased risk for severe illness.[19] "Severe illness" means that an individual with COVID-19 may require "hospitalization, intensive care, a ventilator to help them breathe or they may even die."[20] Nationally, as of October 8, 2021, 12% of all deaths over the past two years involved COVID-19—i.e., 703,699 of 5,822,909. In Colorado, as of October 8, 2021, nearly 10% of all deaths over the past two years involved COVID-19—i.e., 7,996 of 81,258.[21]

The following medical conditions indicate an individual is at risk of severe illness from COVID-19: cancer; chronic kidney disease; chronic lung diseases, including asthma; dementia or neurological conditions; diabetes (type 1 and type 2); down syndrome; heart conditions; HIV infection; immunocompromised state; liver disease; obesity; sick cell disease or thalassemia; individuals who have had an organ or blood stem cell transplant; stroke or cerebrovascular disease.[22] Individuals with limited mobility, trouble understanding information, trouble practicing preventative measures, and limited ability to communicate are also more likely to become infected with COVID-19 or have unrecognized illness.[23] A recent study showed that children with Down Syndrome who contract COVID-19 are four times more likely to be hospitalized and ten times more likely to die than the general population.[24]

---

[19] CDC, Specific Groups of People, Apr. 20, 2021; CDC, Medical Conditions, Aug. 20, 2021, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[20] *Id.*

[21] CDC, Provisional Death Counts for [COVID-19], Oct 8, 2021, available at: https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm.

[22] CDC, Medical Conditions, Aug. 20, 2021, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[23] CDC, People with Disabilities, June 21, 2021, available at: https://www.cdc.gov/ncbddd/humandevelopment/covid-19/people-with-disabilities.html.

[24] https://www.yalemedicine.org/news/down-syndrome-covid-19.

According to Dr. David Beuther, M.D., Ph.D., F.C.C.P., a practicing adult pulmonary and critical care physician and Chief Medical Information Officer at National Jewish Health in Denver, Colorado, and Associate Professor at the University of Colorado, people with cancer, cystic fibrosis and chronic lung disease, asthma, diabetes (Type-1 or Type-2), heart disease, primary immune-deficiency disorders, developmental, physical, or intellectual disabilities, seizure disorders like epilepsy (with inflammation basis of seizures), obesity, and those taking immunosuppressive drugs are at greater risk of contracting and/or experiencing severe illness or even death if they contract COVID-19. (Decl. of Dr. David Beuther, **Ex. 2**, at 9-11.)

Although adults are often more affected by COVID-19 compared to children, children with disabilities, like adults with disabilities, are at an increased risk of severe illness compared to those without disabilities. According to the CDC, "[c]urrent evidence suggests that children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19." [25] And as with adults who face increased risks, "children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19."[26]

### The District Serves Thousands of Students with Health Conditions Putting Them at Greater Risk of Contracting COVID-19 or Severe Illness if They Contract COVID-19

Many School District students have health conditions that put them at greater risk of contracting COVID-19 or experiencing severe illness if they contract COVID-19.[27] Within DCSD, 5,490 students report having asthma. (Decl. of Sid Rundle, **Ex. 16**, ¶ 6.) Over 160 DCSD students

---

[25] CDC, Medical Conditions, Aug. 20, 2021, *supra*.

[26] *Id.*

[27] These students may or may not also be eligible for special education services under the Individuals with Disabilities Education Act based on whether they require specialized instruction given their disability.

report having immunodeficiency disorders. (*Id.*) Nearly 200 DCSD students report having Type-1 or Type-2 diabetes. (*Id.*) Forty DCSD students report having a severe respiratory condition like cystic fibrosis, bronchomalacia, or tracheostomy. (*Id.*) The District also serves many students with developmental, physical, and intellectual disabilities, as well as those with heart conditions, seizure disorders, and other conditions that put students at greater risk of either contracting COVID-19 or experiencing severe illness if they contract COVID-19.

**The School District Also Serves Students Who Have Significant Needs Requiring More Intensive Services that Cannot Be, At This Time, Replicated Remotely**

While the District was able to provide specialized instruction and related services for those students with significant needs remotely in prior years when the school district was serving all students remotely due to the COVID-19 pandemic, effective remote programming requiring intensive services is not readily and currently available for students. Furthermore, effective remote educational programming is not as effective as in person learning and many students with intensive and significant needs, such as students with intellectual disabilities, significant physical limitations, or behavioral challenges, have difficulty learning outside of the school setting, without direct and continuous instruction from specially trained staff. (Decls. of Sarah Cannon, **Ex. 15**, ¶¶ 2-4; Rundle Decl., **Ex. 16**, ¶ 4.) For those students, they cannot fully benefit from their education program through the remote instruction currently available in the District. For example, there are over 700 students in DCSD receiving their instruction within the Significant Support Needs (SSN) classroom setting, designed for students with intellectual disabilities or multiple disabilities who require more intensive services throughout the day. (Cannon Decl., **Ex. 15**, ¶ 3.) Learning in-person is preferable to learning remotely for a variety of reasons, like the instructor's ability to read and interpret body language and other non-verbal cues associated with the learning process,

fluid formative assessments related to progress monitoring, and critical interpersonal connections that facilitate learning. (*Id.*; Rundle Decl., **Ex. 16**, ¶ 4.)

**Masks and Targeted Quarantining Help Prevent the Spread of COVID-19 and Help Ensure Continued Access to In-person Learning**

CDC, American Academy of Pediatrics, CDPHE, and Governor Jared Polis, among others, refer to in-person learning as a high priority for this 2021-22 school year.

COVID-19 forced the School District to move entirely remote instruction between March 16 and May 26, 2020 (2019-2020 school year) and November 30, 2020 and January 5, 2021 (2020-2021 school year). From January 5, 2021 through the remainder of the 2020-2021 school year, District elementary, middle, and high schools returned to a mixture of in-person and hybrid learning, where students were learning in-person and remotely 50 percent of the time.

The Colorado Chapter of American Academy of Pediatrics made clear that "[t]he most important thing we can do for children's mental health and well-being is to keep them safely in their classrooms."[28] CDC, American Academy of Pediatrics, CDPHE, and TCHD, among others, have published guidance regarding returning safely to in-person learning. (*E.g.*, Oct. 8, 2021 Letter from TCHD to DCSD, **Ex. 18**, pp. 1-2 ("[T]o keep kids healthy…and help maintain in-person learning by avoiding the need for the sort of quarantines that many schools experienced last year; **TCHD strongly recommends that schools in Douglas County continue to implement universal masking requirements for all students, staff and visitors in their indoor school settings and abide by quarantine guidance provided by us and [other] expert groups.**" (bolded emphasis in original)). The Colorado Department of Education ("CDE") has explained

---

[28] Colorado Chapter of American Academy Pediatrics, Letter to Governor Polis, Aug. 10, 2021, available at:                https://mcusercontent.com/35ee0fa27d80895fef237e0b2/files/87ce87ef-f2e4-21fb-c547-4139d5abe96d/UniversalMaskingLtr.pdf.

that "[v]accines are our best defense against COVID-19" and help schools operate fully in-person.[29] However, children under the age of 12 are not yet eligible to be vaccinated. And, while children 12 and older can be vaccinated, many are not, and those who are vaccinated may still spread COVID-19, including to younger children and others who either cannot be or are not vaccinated.

Thus, to mitigate the risk of COVID-19, experts recommend following "a multi-pronged, layered approach," which includes universal masking and appropriate quarantining, "mak[ing] in-person learning safe and possible."[30] Indeed, CDC, American Academy of Pediatrics, CDPHE, and TCHD, among others, all recommend (or require) universal indoor masking, regardless of vaccination status, in school settings for students, staff, teachers, and visitors. CDC has explained that "[m]asks are primarily intended to reduce the emission of virus-laden droplets . . . , *which is especially relevant for asymptomatic or presymptomatic infected wearers* who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions."[31] Children's Hospital Colorado also makes clear that "masks are a key step on the road to getting back to normal and providing kids the support systems they need to thrive mentally, emotionally and physically." Ultimately, "[w]hen teachers, staff, and students

---

[29]    CDE,    Best    Practice    Recommendations,    Sept.    14,    2021,    available    at:
https://www.cde.state.co.us/schoolguidance21-22/bestpractices#encouragingvaccinations.

[30] American Academy of Pediatrics, COVID-19 Guidance for Safe Schools, July 18, 2021, available at:
https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/    (explaining    that    combining
"vaccination, universal mask use, ventilation, testing, quarantining, and cleaning and disinfecting . . . will
make in-person learning safe and possible.").

[31] Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2, Ctrs. for Disease
Control & Prevention (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.

consistently and correctly wear a mask, they protect others as well as themselves" and that "protection against exposure remains essential in school settings."[32]

In fact, if universal masking is implemented, students can continue safely learning in-person—even if they have been exposed to COVID-19 at school. According to CDPHE, "[u]nvaccinated students can also avoid quarantine following a typical classroom exposure if both the infected individual and the exposed student were correctly wearing masks."[33] However, if unvaccinated students are not wearing masks during an exposure to COVID-19, these students should quarantine. CDC, CDPHE, and TCHD recommend that unmasked students quarantine following close contact with an individual infected with COVID-19 to reduce transmission and increase school safety, and to avoid disruptions to in-person learning.[34] After all, quarantines "help protect the public by preventing exposure to people who are sick or have been exposed to people who are sick."[35] Quarantines also help prevent asymptomatic and pre-symptomatic individuals— who account for more than 50% of all transmission—from transmitting COVID-19.[36]

---

[32] CDC, Guidance for COVID-19 Prevention in K-12 Schools, Aug. 5, 2021, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[33] CDPHE, Practical Guide for Operationalizing CDC's School Guidance, Sept. 10, 2021, available at: https://covid19.colorado.gov/practical-guide-for-operationalizing-cdc-school-guidance. *See also* Tri-County Health Department, Rationale for Issuing a Public Health Order Requiring Masking in Schools and Child Care Facilities, https://www.tchd.org/DocumentCenter/View/9251/Public-Health-Order-rationale-for-face-coverings-in-school-and-child-care-settings?bidId= (last visited Oct. 12, 2021).

[34] *See* CDPHE, Practical Guide for Operationalizing CDC's School Guidance, Sept. 10, 2021, available at: https://covid19.colorado.gov/practical-guide-for-operationalizing-cdc-school-guidance ("CDPHE recommends quarantine for unvaccinated close contacts that were within six feet for 15 minutes or more of an infected individual if either the infected individual or the contact were unmasked during the exposure."); Tri-County Health Department, Parents of School-Aged Children, https://www.tchd.org/862/Parents-of-School-Aged-Children (explaining TCHD will follow CDPHE guidance for quarantines in schools) (last visited Oct. 13, 2021).

[35] CDPHE, Isolation and Quarantine, March 11, 2021, https://covid19.colorado.gov/isolation-and-quarantine.

[36] CDC, Science Brief: Options to Reduce Quarantine for Contacts of Persons with SARS-CoV-2 Infection Using Symptom Monitoring and Diagnostic Testing, Dec. 2, 202, available at: https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/scientific-brief-options-to-reduce-

Following "a multi-pronged, layered approach," which includes universal masking and appropriate quarantining, "make[s] in-person learning safe and possible."[37]

### The School District's COVID-19 Protocols for the 2021-2022 School Year

The District's policy for managing communicable diseases and long-term illnesses (Policy JLCC) should be in accordance with CDPHE and TCHD guidance.[38] Classes began for the 2021-2022 school year on August 9, 2021. At that time, the School District recommended that all individuals, regardless of vaccination status, wear a mask in indoor public places, including students, staff, and visitors to schools. On August 18, 2021, TCHD issued a new mask order requiring masks for anyone aged 2-11 years-old in any school setting.[39] The order went into effect on August 23. TCHD allowed counties to opt out of this order, which Douglas County did.

DCSD, however, in alignment with its policy providing that its management of communicable diseases be done in accordance with CDPHE or TCHD guidelines, announced that it would require masks inside school buildings for all students under the age of 12, preschool through sixth grade.[40] Thus, starting August 23, 2021, when the TCHD Public Health Order ("TCHD PHO")  took effect, the School District required masks for everyone from preschool to sixth grade in school buildings consistent with the TCHD PHO and its Policy JLCC.

---

quarantine.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fmore%2Fscientific-brief-options-to-reduce-quarantine.html ("Quarantine helps prevent spread of disease that can occur before a person knows they have the virus.").

[37] American Academy of Pediatrics, COVID-19 Guidance for Safe Schools, July 18, 2021, available at: https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.

[38] https://www.dcsdk12.org/common/pages/DisplayFile.aspx?itemId=12496688.

[39] https://www.tchd.org/DocumentCenter/View/9241/MaskOrderSchools_081821_FINAL.

[40] https://coloradocommunitymedia.com/stories/douglas-county-schools-to-require-masks-for-students-in-preschool-through-sixth-grade,380767.

On August 31, 2021, TCHD rescinded its August 18 order (effective August 23) and replaced it with a new order requiring masks in school settings for all people aged two years and older.[41] The order took effect on September 1, 2021. Thus, starting September 1, 2021, the School District required masks for all students and staff, aged two years and older, regardless of vaccination status.[42] The School District collected data showing that the COVID-19 positivity rate decreased among DCSD students between September 8 and October 8, 2021. (Decl. of Corey Wise, **Ex. 17**.) The School District maintained this multi-pronged, layered approach for masking, isolation, and quarantining, consistent with TCHD and CDPHE guidance, until the newly created Douglas County Board of Health issued its Public Health Order on October 8, 2021.

### Douglas County and the Tri-County Health Department

Colorado law requires each county by resolution of its board of county commissioners to establish and maintain a county health agency or to participate in a district public health agency. C.R.S. § 25-1-506(1). Colorado law also permits any two or more contiguous counties to establish and maintain a district public health agency. *Id.* TCHD is a public health agency with powers and duties established by Colorado law. TCHD, until recently, was the public health agency for Douglas County, Adams County, and Arapahoe County. A county may withdraw from a public health agency if it meets certain statutory requirements. *See* C.R.S. § 25-1-513(2).

On September 7, 2021, Douglas County's Board of County Commissioners voted to part ways with TCHD adopting a resolution to withdraw from TCHD and to create its own public health department. On September 14, 2021, Douglas County's Board of County Commissioners passed

---

[41] https://www.tchd.org/DocumentCenter/View/9457.

[42] https://www.dcsdk12.org/about/leadership/superintendent/superintendent_messages/face_coverings_required_for_p-_k12.

a resolution establishing the Douglas County Health Department Board of Health and appointing the Board members. On September 28, 2021, Douglas County's Board of County Commissioners approved an intergovernmental agreement with TCHD to provide public health services to Douglas County, including services to address disease control and prevention. The Board of Health has six members, including three regular members, two County Commissioners, and one interim alternate member. Only one of the members of this Board is a physician (a radiologist) and another is a registered nurse. The Douglas County Health Department does not currently have a Director or any staff.[43]

### Defendants Issue a Medically and Scientifically Baseless Public Health Order Requiring Opt-outs for Masks and Limiting Instances When People May Be Quarantined

On October 8, 2021, Douglas County's newly created health department issued an order entitled, "Public Health Order Allowing Exemptions from Facial Coverings and Preventing Quarantining of Asymptomatic Individuals," effective as of 12:01 a.m. on October 9, 2021, contravenes well-settled science and guidance regarding COVID-19 mitigation, including masking and quarantining. (PHO, **Ex. 1**.)

The DCHD PHO declares that students, teachers, and staff members are no longer required to wear masks if they simply exempt themselves by representing that wearing a mask has a negative impact on their physical and/or mental health, even if the School District has a universal masking policy. (*Id.*) Specifically—despite national and state guidance urging universal masking in school settings and the rising cases of COVID-19 in Colorado and Douglas County—the DCHD Public Health Order states that if a parent or legal guardian of an underage student feels that a face covering has "a negative impact on that individual's physical and/or mental health," they can give

---

[43] *See* https://www.douglas.co.us/health-department (noting that all public health services for Douglas County will be provided by the Tri-County Health Department through December 2022./

16

to school officials a "written declaration" of their desire for a mask exemption. (*Id.*) Adults (those over 18) may exempt themselves without a written declaration. (*Id.*)

The DCHD PHO cites Children's Hospital Colorado to suggest that masks adversely impact the mental health of children. (**Ex. 1** at 3.) But Children's Hospital Colorado itself has controverted this statement, explaining that "[t]here are no valid reports or scientific studies linking masks to mental health problems in children or any other group."[44] Children's Hospital Colorado makes clear that "masks are a key step on the road to getting back to normal and providing kids the support systems they need to thrive mentally, emotionally and physically."[45] In fact, during the public hearing on the Order, an administrator from Children's Hospital Colorado publicly commented that Children's Hospital "wants to make it very clear that there are no valid reports or scientific studies linking masks to mental health problems in children or any other group."[46]

The Douglas County Health Department also cites the American Academy of Pediatrics for the proposition that "cases per 100,000 between states with mask mandates, no mask mandates and prohibition on mask mandates are inconclusive." (**Ex. 1** at 2.) However, the American Academy of Pediatrics, including the Colorado Chapter, unequivocally recommends universal masking in school settings "because a significant portion of the student population is not yet eligible for vaccines, and masking is proven to reduce transmission of the virus and to protect those

---

[44] Children's Hospital Colorado, Masks for Kids: What You Need to Know About Face Coverings, Aug. 16, 2021, available at: https://www.childrenscolorado.org/conditions-and-advice/parenting/parenting-articles/masks-for-kids/

[45] *Id.*

[46] Recording available at https://douglascounty.granicus.com/MediaPlayer.php?view_id=5&clip_id=730 (48:53 – 52:00) (emphasis added).

who are not vaccinated."[47] According to CDPHE, students in Colorado school districts that have not instituted mask mandates are infected with COVID-19 at higher rates than those in districts that have face-covering requirements.[48] "The lower rates of COVID-19 are associated with school districts that are requiring masks in schools," said Dr. Rachel Herlihy, the state epidemiologist, "again showing a clear impact that masks are having in decreasing transmission in our school settings."[49]

The DCHD Public Health Order also makes it impermissible in most cases to quarantine a child within Douglas County due to actual, suspected, or potential exposure related to COVID-19 if the individual is asymptomatic—even though the data shows that asymptomatic and pre-symptomatic individuals contribute to at least 50% of transmissions. While these individuals may feel healthy despite having COVID-19, those they subsequently infect—particularly those with underlying health conditions—are at a far greater risk of severe illness.

The DCHD Public Health Order does not meaningfully support the safety of children or adults, particularly those with disabilities.[50] Yet, if the School District "violates" the public health

---

[47] American Academy of Pediatrics, AAP Updates Recommendations for Opening Schools in Fall 2021, July 19, 2021, available at: https://www.aap.org/en/news-room/news-releases/aap/2021/american-academy-of-pediatrics-updates-recommendations-for-opening-schools-in-fall-2021/ (emphasis added).

[48] Tabachnik, Sam, Denver Post, Colorado schools without mask mandates have higher COVID transmissions, state data shows, Sept. 23, 2021, available at: https://www.denverpost.com/2021/09/23/colorado-school-mask-mandates-covid-transmission/.

[49] Ingold, John, Colorado Sun, Colorado schools that require masks have lower coronavirus case rates, state says, Sept. 23, 2021, available at: https://coloradosun.com/2021/09/23/coronavirus-rates-school-mask-mandates/.

[50] TCHD's guidance to DCSD puts the dangers of the DCHD Public Health Order in stark relief. The same day the DCHD Public Health Order was issued, TCHD explained its guidance regarding masks and quarantines, writing

> [W]e…continue to urge universal mask wearing and following TCHD's COVID-19 quarantine and disease guidance for schools…. Under current guidance, quarantine is not required in routine classroom settings where universal mask wearing is observed. If universal mask wearing is not observed, a school moves to implementing targeted contact identification to limit the number of individuals required to quarantine when case(s) are

order to protect our most vulnerable populations, it is subject to potential civil and criminal penalties provided in C.R.S. § 25-1-516 and C.R.S. § 18-1.3-501.

The day the PHO issued, TCHD sent a letter to the School District's Superintendent and its Board of Education clarifying that TCHD "remain[s] the contracted public health department for Douglas County and continue to urge universal mask wearing and following TCHD's COVID-19 quarantine and disease control guidance for schools."). (Oct. 8, 2021 TCHD Letter, **Ex. 18**.)

### Since the Public Health Order Went Into Effect, Thousands of District Students and Hundreds of District Staff have been Exempted from Wearing Masks and the District has Minimized Authority to Request that Individuals Exposed to COVID-19 be Quarantined

The consequences of the Health Order are already unfolding at the School District. Since the Public Health Order went into effect on October 9, the parents of thousands of District students have exempted their children from wearing masks under the Order. As of the filing of this Complaint, more than 4,500 students have been exempted from wearing masks. (Wise Decl., **Ex. 17**.) This number does not include students at the District's charter schools, which are also subject to the Order. Further, hundreds of District staff have exempted themselves from wearing masks at school pursuant to the Order. As of the filing of this Complaint, over 500 District staff members have exempted themselves from wearing masks. (Wise Decl., **Ex. 17**.) This number also does not include charter-school staff.

---

identified. Contact tracing requires having sufficient school staff capacity and expertise to investigate each exposure situation and to facilitate the investigation (cohorting, seating charts, etc.). If universal masking is not implemented and appropriate capacity and controls for targeted contact identification are not in place, an increased number of students will be subject to quarantine, interrupting critical in-person learning.

(Oct. 8, 2021 TCHD Letter, **Ex. 18**, at 1.) DCSD does not have the staff necessary to conduct the robust contact tracing required without a mask requirement. In fact, one of the primary reasons DCSD chose to require masks was to avoid contact tracing and quarantines. Without the tools of a mask requirement and contact tracing, though, the only public health tool left for DCSD would be quarantines. But the DCHD Public Health Order also significantly limits DCSD's ability to enforce those, leaving DCHD without workable options to combat the spread of COVID-19.

**The Public Health Order Illegally Prevents the School District from Complying with its Legal Obligations under the ADA and Section 504**

The ADA and Section 504 are federal statutes that prohibit discrimination based on a disability. Both statutes require that public entities or those receiving federal funds, like the School District, provide students with disabilities equal access to their programs and services.

The School District has an affirmative obligation to comply with the ADA and Section 504, and it takes that responsibility extremely seriously. Failure to comply with these federal laws deprives individuals of their civil rights. By prohibiting the School District from requiring masks and implementing quarantines consistent with CDPHE and TCHD guidance, Defendants are illegally preventing the School District from complying with its obligations to provide students with disabilities equal access to public education as required under Section 504 and the ADA.

## LEGAL STANDARD

In order to obtain a preliminary injunction, the movant must show that: (1) the movant "is substantially likely to succeed on the merits; (2) [the movant] will suffer irreparable injury if the injunction is denied; (3) [the movant's] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)). In deciding whether to grant a motion for temporary restraining order, courts apply the same factors as when deciding a motion for preliminary injunction. *Winnebago Tribe of Nebraska v. Stovall*, 205 F. Supp. 2d 1217, 1221 (D. Kan. 2002), *aff'd*, 341 F.3d 1202 (10th Cir. 2003).

A court must consider all these factors, but "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, [and therefore] the moving party must first demonstrate that such injury is likely before the other requirements for the

issuance of an injunction will be considered." *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017); *see also Port City Props. v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).

## ARGUMENT

In the last month, federal district courts from around the country have granted preliminary injunctive relief on facts very similar to those before the Court today, enjoining the defendants from enforcing their respective bans on mask mandates in schools.[51] Together, these decisions represent a forceful endorsement by the federal judiciary of the rights guaranteed to students with disabilities under the Title II of the ADA and Section 504, which require public school districts to take reasonable steps to ensure that students with disabilities have equal access to public education as compared with their non-disabled peers. In the context of the COVID-19 pandemic, the national mandate of these statutes leads to an inescapable conclusion: that in order to protect the health and safety of its disabled students, while also guaranteeing their equal access to educational benefits, school districts must be allowed to require that all students and staff wear masks if the schools deem it necessary. The court in *Disability Rights South Carolina* summed it up nicely:

> [J]ust as a law forbidding a school district to install ramps in its building would be held to be an affront to Title II [of the ADA] and Section 504, so is [the South Carolina law], which proscribes a school district from mandating masks, even when it concludes it is appropriate to do so. *Accordingly, masks must, at a minimum, be an option for school districts to employ to accommodate those with disabilities so they, too, can access a free public education.*

---

[51] *See Disability Rights South Carolina v. McMaster*, Case No. 3:21-02728-MGL, 2021 WL 4444841 (D. S.C. Sept. 28, 2021); *The ARC of Iowa v. Reynolds*, Case No. 4:21-cv-00264, 2021 WL 4166728 (S.D. Iowa Sept. 13, 2021); *G.S. by & through Schwaigert v. Lee*, Case No. 21-CV-02552-SHL-ATC, 2021 WL 4268285 (W.D. Tenn. Sept. 17, 2021); *S.B. by & through M.B. v. Lee*, Case No. 321CV00317JRGDCP, 2021 WL 4346232 (E.D. Tenn. Sept. 24, 2021); *R.K. et al. v. Lee*, Case No. 3:21-CV-00725, 2021 WL 4391640 (M.D. Tenn. Sept. 24, 2021); *see also W.S. by Sonderman v. Ragsdale*, Case No. 1:21-CV-01560-TWT, 2021 WL 2024687 (N.D. Ga. May 12, 2021) (denying request for TRO by parents asking to enjoin mask mandate in school).

2021 WL 4444841, at *10 (emphasis added).

In each of these decisions, the court held that the respective plaintiffs had demonstrated both a likelihood of success on the merits and irreparable harm should an injunction not issue. And as is always the case where an individual's civil rights are infringed by state or local regulation, these courts agreed that the public interest is best served by protecting the rights of students with disabilities and upholding the supremacy of federal law.

The same analysis applies here. Defendants' Public Health Order prohibits the School District from utilizing protocols requiring masks, which students with underlying health conditions require as an accommodation to enable them to access their public education equally and safety. And unlike the laws enjoined in Iowa, Tennessee, South Carolina, and elsewhere, Defendants' Public Health Order also prohibits the School District from implementing a quarantine because of exposure to a known COVID-19 positive case unless the exposure is associated with a known outbreak—thus further limiting the District's ability to prevent transmission of this deadly virus. In other words, the law at issue here is even more harmful than those struck down very recently by federal courts across the country.

The Court should enjoin enforcement of Defendants' Public Health Order.

A.   **The Plaintiffs Will Suffer Irreparable Injury Without a Temporary Restraining Order and Preliminary Injunction**

To obtain a preliminary injunction, a movant "must establish ... that he is likely to suffer irreparable harm in the absence of preliminary relief." *New Mexico Dep't of Game and Fish*, 854 F.3d at 1249-50 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Although irreparable harm "does not readily lend itself to definition," "a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Id.* at 1250. A harm need not have already

occurred or be inevitable, but the injury must be "likely to occur before the district court rules on the merits." *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003)). "[A] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative." *Id.* (quoting *Greater Yellowstone Coal.*, 321 F.3d at 1258).

Here, the evidence shows that the Individual Plaintiffs will suffer irreparable harm in three ways if the Public Health Order is not enjoined and the School District is prevented from mandating universal masking: (1) the Individual Plaintiffs will face a heightened risk of contracting COVID-19, a potentially deadly viral contagion; (2) the Individual Plaintiffs will lose educational opportunities; and (3) the Individual Plaintiffs' civil rights will be violated.

Additionally, the School District will be irreparably harmed in the absence of injunctive relief because the School District will be forced to either violate a public health order (by mandating masks) or violate federal law by not mandating masks and causing the aforementioned harm to the Individual Plaintiffs—a lose-lose scenario that no damages could adequately remedy.

In the opinion of Dr. David Beuther, a practicing pulmonary and critical care physician and Chief Medical Information Officer at National Jewish Health in Denver, Colorado, the DCHD PHO has "no legitimate basis in science or medicine." (Beuther Decl., **Ex. 2**, at 15.) According to Dr. Lindsey Fish, an internal medicine physician at an urgent care clinic affiliated with Denver Health and Hospital Authority, who regularly treats patients with COVID-19, the DCHD PHO "will harm the educator staff, children and families of this county." (Fish Decl., **Ex. 3**, at 3.)

### 1.    The Individual Plaintiffs

The individually named Plaintiffs first risk the irreparable harm of contracting a deadly virus. Given their underlying health conditions, ranging from asthma, cystic fibrosis, and epilepsy to intellectual and developmental disabilities and rare genetic disorders, the Individual Plaintiffs

each face a greater risk of contracting COVID-19 or experiencing severe illness, or even death, if they contract COVID-19. (*See* Beuther Decl., **Ex. 2**, at 9-11.) And most of these students cannot yet be vaccinated since they are under the age of 12. (Parent Decls., **Exs. 4** through **14**.) Masks and quarantining protocols are proven to be an effective means of reducing transmission of COVID-19 (Facts, *supra*, at 10-13.)[52] And we know that a lack of mask-wearing in schools substantially increases the risk of transmission of COVID-19. (Fish Decl., **Ex. 3**, ¶ 43.) Yet Defendants' PHO prohibits the School District from requiring students and staff in schools to wear masks. *See* **Ex. 1**, at 3.) Because these children have underlying health conditions that put them at greater risk of contracting, or suffering severe illness if they contract, COVID-19, prohibiting the District from taking basic steps proven to reduce the transmission of this disease puts them at risk of contracting and suffering harm from COVID-19. Courts across the country have consistently held that exposure to a potentially fatal virus is an irreparable harm that cannot be remedied at law. *E.g., Carranza v. Reams*, __ F. Supp. 3d __, 2020 WL 2320174 (D. Colo. May 11, 2020) (Brimmer, C.J.) (granting preliminary injunction based on risk of COVID-19 to medically vulnerable inmates in jail); *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993) (explaining that the court "entertain[s] no question but that irreparable injury exist[s]" when the harm is a "life threatening interest"); *The ARC of Iowa v. Reynolds*, __ F. Supp. 3d __, 2021 WL 4166728, at *9 (S.D. Iowa Sept. 13, 2021) ("Because [the disabled] Plaintiffs have shown that [Iowa's] ban on mask mandates in schools substantially increases their risk of contracting the virus

---

[52] Beuther Decl., **Ex. 2**, pp. 11-14; Fish Decl., **Ex. 3**, pp. 8-11; *see also* Beuther Decl., **Ex. 2**, p. 13 ("A vulnerable student or staff member is only safe at school when everyone else is wearing a proper face covering throughout the school day. If mask use is incomplete or voluntary among other students and staff and viral transmission and case rates in the community are high, having a vulnerable student wear their cloth or surgical mask around others that are unmasked is unacceptably inadequate protection for them.")). A lack of mask-wearing in schools substantially increases the risk of transmission of COVID-19. (Fish Decl., Ex. 3, ¶ 43.)

that causes COVID-19[,] and that due to their various medical conditions they are at an increased risk of severe illness or death, Plaintiffs have demonstrated that an irreparable harm exists."); *Disability Rights S.C.*, Case No. 3:21-02728-MGL, at * 7 ("[T]he risk of the minor plaintiffs just contracting COVID-19 constitutes irreparable harm."); *Thakker v. Doll*, 451 F. Supp. 3d 358, 365 (M.D. Pa. 2020) (concluding "[t]here can be no injury more irreparable" than "a very real risk of serious, lasting illness or death").

Second, if the DCHD Public Health Order is not enjoined, the Individual Plaintiffs face the loss of educational programming and services. Given the increased risk of severe illness and death posed by COVID-19 to the Individual Plaintiffs, the parents of these students either have already or may be forced to temporarily remove them from school to protect their health. (*See, e.g.*, Decl. of G.W., **Ex**. **6**, ¶ 9 ("Now that parents again have the choice to opt out, I am terrified of sending D.W. and his siblings back to the school, so much so that I have kept D.W. at home."); (Decl. of K.G., **Ex**. **10**, ¶ 9 ("Should there come a point when more exemptions are issued for children in his classroom, I will have no choice but to remove J.G. from his school community.")). But this merely replaces one irreparable harm with another. Students benefit from in-person instruction. (Decl. of Sid Rundle, **Ex**. **16**, ¶ 4), and students with significant disabilities require in-person instruction in a setting specially designed to meet their unique needs. (Cannon Decl., **Ex**. **15**, ¶ 3.) Forcing these students to choose between staying home and being safe and attending school and putting themselves at risk of harm is a paradigmatic example of irreparable harm. *See ARC of Iowa*, 2021 WL 4166728, at *9; *G.S. v. Lee*, __ F. Supp. 3d __ 2021 WL 4057812, at *8 (W.D. Tenn. Sept. 3, 2021) ("Plaintiffs have satisfied their burden of showing that irreparable harm will result if the Governor's Executive Order remains in place by including in their pleadings information regarding the threat of COVID-19 and alleging that '[w]ithout the ability to implement

a universal mask mandate, Plaintiffs will continue to be exposed to an increased risk of infection, hospitalization, or death because of COVID-19, or they will be forced to stay home and denied the benefits of an in-person public education.'"); *Plyler v. Doe*, 457 U.S. 202, 230-31, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child"); *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) ("[E]ven a 'few months' in an unsound program can make 'a world of difference in harm' to a child's educational development" (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121-22 (1st Cir. 2003))); *Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1270-71 (S.D. Fla. 2011) (concluding that a disabled child's inability to attend classes without an accommodation constitutes irreparable harm and granting temporary injunctive relief).

Finally, the DCHD PHO is causing irreparable harm to the Individual Plaintiffs because it violates their federal civil rights. *See* Section III-B, *infra*. Where a "defendant has violated a civil rights statute," courts can "presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (collecting authority); *see also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"). Thus, the Defendants' violation of the ADA and the Rehabilitation Act alone shows irreparable injury.

## 2. The School District

The School District also faces irreparable harm if the Public Health Order is not enjoined immediately. The School District is required by federal law to provide its students with disabilities access to public education in a manner equal to their non-disabled peers. As noted, that means providing reasonable accommodations that enable such students to access their public education

equally. The School District serves thousands of students with disabilities within the meaning of Section 504 who have underlying health conditions putting them at greater risk of contracting or suffering severe illness if they contract COVID-19. Protocols requiring masks for all students and staff and the ability to ask that individuals exposed to COVID-19 quarantine are reasonable accommodations enabling students with such underlying conditions can access their public education equally. The DCHD PHO is preventing the School District from providing these reasonable accommodations and therefore complying with its obligations under Section 504 and the ADA. If the School District or its employees defy the Health Order, they face the possibility of criminal prosecution under Colo. Rev. Stat. § 25-1-516, which creates a misdemeanor "for any person, association, or corporation to . . . willfully violate, disobey, or disregard the provisions of the public health laws or the terms of any lawful notice, order, standard, or rule[.]" *Id.* § 516(1)(a)[53]. The Order explicitly references this criminal statute. (PHO, **Ex. 1**, at 5.)

Thus, the School District faces a Hobson's choice: either comply with the Public Health Order and, in so doing, expose itself to claims of violating its students' civil rights; or comply with the ADA and Section 504 by mandating universal masking and, in so doing, risk exposing itself and its employees to criminal prosecution in state court. Either way, the School District would shoulder a significant risk of liability and reputational harm in the community. Merely being placed in this untenable situation constitutes an irreparable injury. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (finding that the possibility local businesses would be investigated and face civil or criminal liability from the state for violating a state law that was preempted by federal law "demonstrate[s] a likelihood of irreparable harm" to those businesses); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309-10 (S.D. Fla. 2008) ("The threat of

---

[53] The School District does not concede that the Public Health Order is a "lawful…order."

criminal prosecution also constitutes irreparable harm…. Because of the number of federal regulations governing Plaintiffs' conduct, the likelihood of minor violations of federal law is constant and unpredictable" and therefore the plaintiffs, which would also run the risk of criminal prosecution under state law, had shown they would suffer irreparable injury); *Edgar v. MITE Corp.*, 457 U.S. 624, 651 (1982) (Stevens, J., concurring) ("An individual who is imminently threatened with prosecution for conduct that he believes is constitutionally protected should not be forced to act at his peril[.]"); *Villas at Parkside Partners v. City of Farmers Branch,* 496 F. Supp. 2d 757, 776 (N.D. Tex. 2007) ("A party may be irreparably injured in the face of the threatened enforcement of a preempted law.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *Nat'l City Bank of Ind. v. Turnbaugh*, 367 F. Supp. 2d 805, 821 (D. Md. 2005), *aff'd by* 463 F.3d 325 (4th Cir. 2006) (finding that there is no adequate remedy at law where a plaintiff bank is "forced to comply with [ ] conflicting [state banking] laws").

This risk of criminal prosecution leaves the School District with no choice but to comply with the DCHD Public Health Order. Additionally, if any students contracted COVID-19 while unmasked at school, the School District could be exposed to additional lawsuits, which a parent in Wisconsin is reported to have filed very recently.[54]

## B.     The Plaintiffs are Substantially Likely to Succeed on the Merits

The DCHD PHO violates the individually named Plaintiffs' civil rights under the ADA and Section 504 and is illegally preventing the School District from complying with its obligations under the ADA and Section 504. (Compl., ECF No. 1.) The DCHD PHO is also preempted by federal law and is therefore void and unenforceable. (*Id.*)

---

[54] Gina Harkins, *Parents sue Wisconsin schools after their children catch covid: 'Recklessly exposing the public'*, WASH. POST, Oct. 12, 2021, https://www.washingtonpost.com/nation/2021/10/12/parents-sue-wisconsin-schools-covid-masks/.

1.      **Defendants' Public Health Order discriminates against students with disabilities within the meaning of Title II of the ADA and Section 504 of the Rehabilitation Act (Claims 1 and 2 as to Individual Plaintiffs).**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Those statutes "involve the same substantive standards," so courts "analyze them together." *Miller v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1245 (10th Cir. 2009).

Both the ADA and Section 504 prohibit discrimination against a person with a disability based on that person's disability. *See* 42 U.S.C. § 12132. Both also require public entities, or those receiving federal funds, including public school districts and other state entities (like a public health agency), to afford students with disabilities an equal opportunity to participate in or benefit from any aid, benefit, or service provided to others. 28 C.F.R §§ 35.130(b)(1) (ADA); 34 C.F.R. §104.4(b)(ii) (Section 504). This requires that public entities administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). This setting, according to the regulations, is one "that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § 35.130. Additionally, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis

of disability, unless [it] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

Along these lines, it is not enough to merely provide physical access to school. As the Tenth Circuit has emphasized, "the ADA requires public entities to provide disabled individuals *meaningful* access to their programs and services." *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003). And as the Supreme Court has explained, "to assure meaningful access, reasonable accommodations in the [public entity's] program or benefit may have to be made." *Alexander v. Choate,* 469 U.S. 287, 301 (1985).

To demonstrate a violation of Title II of the ADA or Section 504, a plaintiff must demonstrate that: (1) she is a qualified individual with a disability; (2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and (3) that such exclusion, denial of benefits, or other discrimination, was by reason of her disability. *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). These elements are met here.

First, each of the Individual Plaintiffs has a disability within the meaning of Section 504 and Title II of the ADA. A person with a disability under Section 504 and Title II of the ADA is someone with a physical or mental impairment that substantially limits a major life activity. 34 C.F.R. § 104.3(j). The regulations to the ADA clarify that the definition of "disability" shall be "*construed broadly* in favor of expansive coverage." 28 C.F.R. § 35.108(a)(2) (emphasis added). A "physical or mental impairment" means (a) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, like neurological, musculoskeletal, special sense organs, respiratory, cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine, or (b) any mental or

psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability. 28 C.F.R. § 35.108(b). A physical or mental impairment includes but is not limited to: contagious and noncontagious diseases and conditions such as orthopedic, visual, speech, and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, ADHD, HIV/AIDS, tuberculosis, drug addiction, and alcoholism. *Id.* A "major life activity" includes, but is not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, sitting, reaching, lifting, bending, speaking breathing, learning, reading, concentrating, thinking, writing, communication, interacting with others, and working, and the operation of a major bodily function. 28 C.F.R. § 35.108(c)(1). "Substantially limits" means an impairment that limits the ability of an individual to perform a major life activity "as compared to most people in the general population." *Id.* § 35.108(d).

Each of the individually named Plaintiffs meet this definition. Plaintiff J.G. has cystic fibrosis, a progressive, genetic disease that causes persistent lung infections and limits the ability to breathe. (**Ex**. **10**.) Plaintiff D.B. has Down Syndrome and developmental and intellectual disabilities. (**Ex**. **8**.) Plaintiffs A.R. and D.W. have moderate-to-severe asthma, a condition causing airways to narrow and swell and may produce extra mucus, making breathing difficult, triggering coughing and wheezing. (**Exs**. **12** & **6**.) Plaintiff C.B. has autism and intellectual disabilities. (**Ex**. **5**.) Plaintiff B.A. has epilepsy, a neurological disorder that causes seizures, and a heart-valve disorder called Mitral Valve Prolapse. (**Ex**. **7**.) Plaintiff M.M. has a rare disease called Arthrogryposis Multiplex Congenita, a variety of conditions involving multiple joint contractures or stiffness and muscle weakness, as well as an intellectual disability. (**Ex**. **11**.) Plaintiff R.P. has

Type-1 Diabetes, which occurs when the body's immune system attacks insulin producing cells and stops producing insulin. (**Ex**. **4**.) And Plaintiff A.L. has a rare genetic disorder called Partial Trisomy 1q, which has caused significant developmental and intellectual delays, and a respiratory disorder. (**Ex**. **13**.) These impairments substantially impact daily life activities for these Plaintiffs. Thus, each Plaintiff qualifies as a child with a disability under Section 504 and the ADA.

Second, the individually named Plaintiffs are being denied the benefits of public education and excluded from the services to which they are entitled. Each of these children have underlying health conditions that put them at greater risk of contracting or suffering severe illness if they contract COVID-19. Protocols requiring universal masking and the ability to request that individuals exposed to COVID-19 are quarantined consistent with CDPHE and TCHD guidance are reasonable modifications and accommodations enabling children with such conditions to access their public education safely and equally. Indeed, often school districts install ramps for children with physical limitations and scrub the school cafeteria for peanuts to accommodate children with severe peanut allergies. Likewise, the individually named Plaintiffs require universal masking and the ability to request that individuals exposed to COVID-19 quarantine consistent with CDPHE and TCHD guidance as reasonable modifications and accommodations to access their public education equally and safely. Defendants' PHO is needlessly and illegally preventing the School District from making those modifications and accommodations available to the individually named Plaintiffs and thereby discriminating against them.

Finally, the sole reason the individually named Plaintiffs are being denied access to their education is by reason of their disabilities. The Individual Plaintiff children face a higher risk of lasting injury or death if they contract COVID-19 than do non-disabled children. (Beuther Decl., **Ex. 2**, at 9-11; Fish Decl., **Ex**. **3**, at 5.) Colorado schools that do not require universal masking

have markedly higher levels of COVID-19 transmission. (Beuther Decl., **Ex. 2**, at 10 ("[T]he difference in COVID-19 pediatric cases showed a four-fold increase in rates…in school districts that did not require a mask compared to those that did require a mask…."). While parents of children who are not especially vulnerable may believe there is little risk in sending their children unmasked to a high-transmission school, the parents of medically vulnerable, disabled children do not have this option. Their children, because of their disability, face greater risk of contracting COVID-19 and/or suffering severe illness if they contract COVID-19. In other words, while members of the School District community can be exempted from wearing a mask, non-disabled children may continue to have access to their education, but the Individual Plaintiffs, given their disabilities, are being deprived of meaningful access to their public education because they either come to school and put their health at risk or stay home and lose out on in-person learning. That is, by definition, discrimination based on a disability.

> 2.    **Defendants' Public Health Order illegally prevents the School District from complying with Title II of the ADA and Section 504 (Claims 1 and 2 as to the Plaintiff School District)**

The DCHD PHO also, as noted, prevents the Plaintiff School District from complying with its obligations under Title II of the ADA and Section 504. COVID-19 is a dangerous and potentially deadly disease and, with the new Delta variant, infection rates are growing in Colorado and Douglas County. (Facts, *supra*, at 4-7.) The District serves thousands of students with the types of underlying health conditions that put them at greater risk of contracting COVID-19 and/or suffering severe illness if they contract the disease. (*Id.*, *supra*, at 9.) Protocols requiring universal masking, and the ability to request that people exposed to COVID-19 quarantine consistent with CDPHE and TCHD guidance, are reasonable modifications and accommodations enabling children with disabilities that have health conditions putting them at greater risk of contracting or

suffering severe illness if they contract COVID-19 to access their public education equally and safely. The DCHD PHO is illegally preventing the District from instituting those modifications and accommodations, meaning the Health Order is effectively causing the District to violate the civil rights of its students with disabilities within the meaning of the ADA and Section 504.

### 3. The DCHD Public Health Order is Preempted by Federal Law

The U.S. Constitution ensures that federal law is "the Supreme Law of the Land." U.S. CONST. art. VI, cl. 2. The Supremacy Clause, thus, "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty. v. Automated Med. Lab., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)). "Under the Supremacy Clause, federal law may supersede state law in several different ways." *Id.* One of which is when "state law is nullified to the extent that it actually conflicts with federal law." *Id.* "Such a conflict arises ... when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

The DCHD PHO conflicts with the ADA and Section 504 for all the reasons discussed. In short, prohibiting the School District from requiring masks for its students and staff, and prohibiting the District from asking any individual exposed to COVID-19 to quarantine consistent with CDPHE and TCHD guidance, violates the individually named Plaintiffs' federal civil rights under Section 504 and Title II of the ADA and causes the School District to violate those civil rights, as well. Thus, the PHO "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S.Ct. 399.

Defendants, and the School District, are "duty bound not to enforce a statutory provision if doing so would either cause or perpetrate unlawful discrimination." *Astralis Condo. Ass'n v.*

*Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 69 (1st Cir. 2010) (explaining that in the context of the Fair Housing Amendments Act, "to the extent that state statutes or local ordinances would undercut the FHAA's anti-discrimination provision, the former cannot be enforced"); *see also Trovato v. City of Manchester, N.H.*, 992 F. Supp. 493, 498, 499 (D.N.H.1997) (same).

For these reasons, Plaintiffs are substantially likely to be successful on the merits of their preemption claim.

**C.      The Balance of Equities Weighs Heavily in the Plaintiffs' Favor and an Injunction Serves the Public Interest**

When the government is a party, as is the case here, the so-called "balance of the harms" and "public interest" factors merge and are properly considered together. *Colo. v. DeJoy*, 487 F. Supp. 3d 1061, 1064 (D. Colo. 2020), *reconsideration denied*, No. 20-CV-2768-WJM-STV, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Here, the balance of equities tips decisively in favor of the Plaintiffs and an injunction is undoubtedly in the public interest. Defendants cannot show that they, or anyone else, will suffer any legitimate harm if the DCHD Public Health Order is enjoined. Not only is the efficacy of masks at preventing the transmission of COVID-19 well established, but there is no scientific or medical evidence supporting the purported basis of the Health Order—that it negatively impacts the mental health of the wearer. In fact, while the Order references a May 25, 2021 declaration from Children Hospital's about a youth mental health crisis (PHO, **Ex. 1**, p. 3), a representative of Children's Hospital appeared telephonically at the Douglas County Board of Health hearing regarding the Public Health Order and strenuously refuted that masks cause any harm to mental health.[55] The bottom line is: "[n]o one can reasonably argue that it is an undue burden to wear a

---

[55] *See* recording of Douglas County Board of Health's October 8, 2021 public meeting, available at: https://www.douglas.co.us/government/commissioners/citizen-advisory-boards-committees-and-commissions/board-of-health, (48:53 – 52:00); (*see also* Beuther Decl., **Ex. 2**, at 15 ("It is my professional

mask to accommodate a child with disabilities." *Disability Rights*, 2021 WL 4444841, at \*9.

Whatever concerns may exist about wearing a mask are greatly outweighed by the countervailing public interest of combatting a pandemic and providing for the health and education of children with disabilities. Public health and enforcing anti-discrimination laws are squarely within the public interest. *E.g.*, *PGA Tour, Inc., v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 18791889, 149 L. Ed. 2d 904 (2001) (ADA's "broad mandate" is to "eliminate discrimination against disabled individuals." with the objective of "integrat[ing] them 'into the economic and social mainstream of American life.'"); *Carranza v. Reams*, __ F. Supp. 3d __, 2020 WL 2320174, at \*11 ("[M]inimizing the exposure of [students] with pre-existing vulnerabilities furthers public health, which is a matter of public interest…'[t]he public has a critical interest in preventing the further spread of the coronavirus.'" (Brimmer, C.J.) (quoting *Banks v. Booth*, 2020 WL 1914896, at \*12 (D.D.C. Apr. 19, 2020))).

And when these critical national interests run up against contradictory state or local law, courts from across the country have recognized that the national public interest trumps any state or local municipality's interest in enforcing its own contradictory orders. As the Tenth Circuit has stated, "[o]nce it is determined that the state laws are preempted by federal law, the harm the state may suffer if its laws are not enforced becomes irrelevant. Rather, 'the public interest will perforce be served by enjoining the enforcement of invalid provisions of state law.'" *Edmondson*, 594 F.3d at 771 (quoting *Bank One (Utah), N.A. v. Guttau*, 190 F.3d 844, 847 (8th Cir.1999)); s*ee also The ARC of Iowa*, 2021 WL 4166728, at \*12 (finding that the public interest was served by enforcing the ADA and Section 504); *G.S. v. Lee*, 2021 WL 4057812, at \*8-9 (same).

The equities here lie entirely on one side. As a federal court in South Carolina recently

---

opinion that the [Public Health Order] unnecessarily endangers public health with no legitimate scientific or medical basis.").

stated in addressing similar claims, "This is not a close call." *Disability Rights*, 2021 WL 4444841, at *11. The Court should immediately enjoin enforcement of the Public Health Order and issue a temporary restraining order and a preliminary injunction enjoining enforcement of the DCHD Public Health Order for the duration of this action.

### D. Defendants Would Not Suffer Any Costs or Damages If Wrongly Restrained and Therefore the Court Should Waive the Security Requirement

Rule 65(c) provides that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Tenth Circuit has held that "a trial court has wide discretion under Rule 65(c) in determining whether to require security" and the court is therefore free to impose no bond whatsoever. *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotation marks omitted).

Here, the Court should issue a temporary restraining order and preliminary injunction without requiring security. The Defendants are "in no way harmed by the issuance of injunctive relief" and therefore bond is unnecessary. *Disability Rights*, 2021 WL 4444841, at *9.

### REQUESTED RELIEF

Plaintiffs ask the Court to immediately issue a temporary restraining order enjoining enforcement of the October 8, 2021 DCHD PHO "Allowing Exemptions from Facial Covering and Preventing Quarantining of Asymptomatic Individuals," issued by the Douglas County Board of Health and Health Department, and order that the Public Health Order has no legal effect until further order of this Court. This will return the parties to the position they were in before the Public Health Order was ordered.

Plaintiffs also ask the Court to set an evidentiary hearing for a preliminary injunction and,

following that hearing, enjoin enforcement of the Public Health Order and order that the Public Health Order has no legal effect for the duration of this case.

Notably, issuing the temporary restraining order and preliminary injunction will impact not only the School District. To the contrary, nothing in the PHO limits its scope, so it applies to all schools, employers, businesses, and other establishments in Douglas County.[56]

## CONCLUSION

Defendants' Public Health Order is violating the individually named Plaintiffs' civil rights and is illegally preventing the Plaintiff School District from complying with its obligations under federal law. Plaintiffs are substantially likely to prevail on their claims; the balance of equities greatly favors enjoining enforcement of the DCHD Public Health Order; and allowing the Order to remain in effect will cause immediate and irreparable harm. For these reasons, Plaintiffs request that this Court enter an order immediately enjoining enforcement of the DCHD PHO, set a hearing on the request for a preliminary injunction, and order that the DCHD PHO be enjoined for the remainder of this case.

---

[56] *E.g.*, Littler Mendelson P.C., Douglas County, Colorado Enacts Public Health Order That Conflicts With Colorado, CDC and OSHA Guidance on COVID-19 Quarantine, October 14, 2021, available at: *https://www.littler.com/publication-press/publication/douglas-county-colorado-enacts-public-health-order-conflicts-colorado* (providing guidance that "[t]he PHO presents employers in Douglas County with a Catch-22. On the one hand, the PHO provides that it 'may be enforced by any appropriate legal means,' and expressly references enforcement mechanisms such as fines, imprisonment, or injunctive relief. On the other hand, the weight of Colorado's, the CDC's, and OSHA's guidance all urge more stringent rules with regard to face coverings and quarantine periods. Further, failure to comply with OSHA's guidance on providing a safe workplace in light of the continuing COVID-19 pandemic could result in monetary fines or enforcement actions.").

Respectfully submitted this 20th day of October 2021.

CAPLAN AND EARNEST LLC

*s/ Elliott V. Hood*
Elliott V. Hood
3107 Iris Avenue, Suite 100
Boulder, CO 80301
Phone: 303-443-8010
Fax:     303-440-3967
ehood@celaw.com

*s/ John F. Peters*
John F. Peters
3107 Iris Avenue, Suite 100
Boulder, CO 80301
Phone: 303-443-8010
Fax:     303-440-3967
jpeters@celaw.com

*Attorneys For Plaintiffs*

## CERTIFICATE OF SERVICE & NOTICE

I HEREBY CERTIFY that on October 20, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I further certify that a copy of this Motion, and all exhibits, the Complaint, and Motion to Proceed Under Pseudonym, all filed concurrently with this Motion, are being provided by email and by process server to the Douglas County Attorney's Office concurrently with the filing of this motion.

*s/Shelley McKinstry*
Shelley McKinstry, Paralegal